Thank you your honor. I represent Mr. Velazquez. Mr. Gunn, I'm having a hard time hearing you. I don't know why. Can you hear me better now your honor? Yes, a little. I could try putting a head microphone on if you think that would be better. I have no idea. Kwame. Is Judge Mulgren hearing me now? I can hear you but you're faint. Yes, barely. Let me try putting the headphone on. I've used that in other arguments. I took it off for this because the tech guy had told me I was good enough with this. But let me try the head microphone to see if that's better. If I can take one minute to hook it in. Thank you. Yeah, we're hearing Mr. Gunn very well in the courtroom. Is that any better? Yes. Yes. It's a little better. Yes. And please excuse me looking like some airplane pilot or something. Just keep your voice up. I'll try to do that your honor. And I'm going to try to reserve three minutes for rebuttal and I will try to keep track of my time. Before I get caught up in the substantive issues and because it's something that sometimes gets put off and not talked about, I want to make sure it's clear why the errors here weren't harmless. This case rose or fell on Mr. Velasquez's testimony or at least whether that created reasonable doubt. The government calls that testimony a quote fanciful story unquote. But whether a witness's testimony is a quote fanciful story unquote or the truth, it's the most basic call that's left for the jury. The jury could have chosen to believe Mr. Velasquez's testimony or just believed it might be true, just had a reasonable doubt about it. And the errors that we've talked about in the briefs directly impacted that judgment. First, trivializing the reasonable doubt standard lowered how sure the jury needed to be that Mr. Velasquez's testimony wasn't true. And second, the evidentiary errors all directly went at that testimony. You have a trained agent giving an opinion that Mr. Velasquez wasn't telling the truth and being allowed to give the reasons for that opinion. You have the prosecutor hammering and cross-examination the rebuttal case and closing argument about why didn't he say this when he was arrested. You have the court excluding evidence that Mr. Velasquez corrected the one lie that he ended up admitting he did tell at the time of arrest. And you have the agent giving an opinion that basically says people who have drugs hidden in their car this way always know. So those errors, this isn't a case where you can just say, well, the errors didn't affect anything and none of it mattered. So Mr. Gunn, the first error that you note, the arguments, the statements of the prosecutor during the closing argument, are those the sort of error or is that the sort of error that can be cured in any way? In other words, is there anything the court can do once those statements are made or is that essentially something that just can't be corrected? DeBell is wrong and you need to have a mistrial at that was a different reasonable doubt instruction. The judge tried to correct it. Well, he actually tried to correct it the first time by referring to the reasonable doubt instruction. The problem with this reasonable doubt instruction, unlike the Devin and Blackmar one that I also cite in my briefs, is this reasonable doubt instruction says you have to be firmly convinced, but it says nothing about what you have to be firmly convinced about. So what you needed here was something supplemental that said, no, what you need to be firmly convinced about are, if you wanted to use the Devin and Blackmar instruction as an example, the most important decisions in your life. So Mr. Gunn, so there's two components into your argument. The first that the comments, the prosecutor's comments in themselves were inappropriate. And second, that the instruction, the court's instruction was an error. No, I'm not. You're not arguing instructional error? No, I'm not arguing the instruction was in the, the, the problem is there was something additional. If, if the prosecutor hadn't argued what the prosecutor argued, the instruction would have been acceptable, at least according to ninth circuit precedent. That instruction has been upheld in ninth circuit case law, but it hasn't been said to be sufficient when the prosecutor made an improper argument like this. When the prosecutor made an improper argument like this, you need to do something more with an instruction. I'm sorry. Go ahead. Go ahead, Judge Beatty. I was just going to ask what, what does the court need to do? Because I think that by my count, maybe I'm wrong here. I trust you know, the transcript far better than I do, that the judge made at least four attempts to correct and to state what the actual instruction is. The prosecutor did as well. I understand your position is that doesn't matter once they make the misstatements, but what does the court need to do to correct the error? I think what the court needed to do in this situation is say something to the effect of the prosecutor's argument is wrong or supplement the reasonable doubt instruction with language similar to what's in the Devin and Blackmar instruction saying that a reasonable doubt, I'm going to give you a supplemental instruction on reasonable doubt. A reasonable doubt is when you're firmly convinced on a decision that's among the most important affairs of your life or something to that effect. Something similar to the Devin and Blackmar language. Is that a backdoor argument of an instructional error? Well, I think, I guess you could call it that. I guess, I guess what it's an argument, it's, it's, it's an argument that something more needed to be done when the prosecutor correct an improper argument. So it's more an argument that more stronger curative action needed to be taken. Mr. Gunn, as Judge Beatty noted, the court initially tried to make some correction. Is your argument here with respect to the standard of proof error primarily that on the later objection the judge took no action to cure at that point? Is that what you primarily think this argument hinges on? I don't think it hinges just on that, your honor. I think even the instruction wasn't sufficient because of the reasons I just gave. The instruction doesn't address the question of what types of decisions you have to be firmly convinced about. But you're not challenging the instruction here? No. Merely it's a prosecution statement? Yes, sir. All right. I mean, I would like to challenge the instruction because I think the Devin and Blackmar one is much better, but there's night circuit case law that's upheld this instruction, but it hasn't upheld the argument. If the court doesn't have any more questions about that issue, I'll move on to the issue about the agent giving his opinion that Mr. Velazquez wasn't telling the truth. The idea that the principle that a witness can't give an opinion on whether another witness is telling the truth and that that's a question that's left for the jury is probably one of the most fundamental principles of our evidentiary rules. You don't have experts on the truth coming in. You don't have government agents coming in and saying, oh, I don't think he was telling the truth. You especially don't have government agents coming in and saying, I don't think he was telling the truth and here's why. I don't think the government argues with you on that point, but the argument seems to be based on the timing and it does appear that the first time the agent was asked a question about whether he believed the defendant was telling the truth was in the defense attorney's cross-examination of the agent on the government's case-in-chief and that the government did not ask any question about that until the rebuttal and it was one question that was answered and the objection was sustained. I mean, do I have the timeline wrong? I think you're right that that's the government's main justification. They don't defend the testimony in of itself. I think there's a couple nuances there that your honor's overlooking. One is, and I mentioned this in my reply brief, the cross-examination in the agent's first testimony in the case-in-chief was not about whether he in fact didn't believe Mr. Velasquez. It was that he told Mr. Velasquez he didn't believe him and the context is very important. If I can refer your honor, it's in supplemental excerpt of record 245 to 246. The question there is sandwiched between questions about how the agent was pressuring Mr. Velasquez and clearly intended to paint a picture of he even declined to admit anything when you were pressuring him like this. The first question is one of your goals of that interview was to see if you could get Mr. Velasquez to admit that he there were times where you told him you didn't believe what he was saying. And then the next question, and you were confrontational with him, weren't you? So the questions there, it's not being offered for the truth of whether the agent believed or not. It's being offered as part of this theme that you were pressuring him and saying these things to him to try to get him to admit things. And I don't think that opens the door. Well, I understand your argument and I read that testimony and I agree with you that the defense attorney began that line of questioning. And whether that opens the door or not to me, I think it's a closer call because the assumption and the question or what he's asking the agent is to tell the jurors that I told him I didn't believe him. That's a fine line between saying I didn't believe him. So I'm not sure how that becomes prejudicial. But the thing that's more troubling to me, I appreciate your argument and want to hear your response, is that I think the defense attorney perhaps just got more caught up in the line of questioning and continued and got to the point where he asked essentially you told him you didn't believe him and the agent quibbled with what does essential mean? And then he said, you didn't believe him. So he went too far. He asked the question. And I don't think the fact that he previously asked different questions changes that he ultimately asked this question. That question, your honor, didn't get answered. That question the prosecutor objected to and the objection was sustained. So even if that was a slip up by the attorney that might have opened the door, if it was answered, it wasn't answered. But the attorney still opened the door and introduced this idea. I understand your position and agree that witnesses shouldn't be bolstering or undercutting each other's credibility in that way. But the defense attorney is the one who first brought this up. That's indisputable. And ask those questions. So then the question to me becomes, how does that become prejudicial when the government asks one question that is the objection is sustained, even though the agent did answer when he shouldn't have? Well, it's two reasons. First of all, I do need to go back. I think what matters is not the attorney's question, but what answer there is, if any. So that's a class of construction. But the other reason is prejudicial, your honor. To the extent the idea got brought up, the really prejudicial part about this isn't just so much the agent saying he didn't believe Mr. Velasquez, though that's pretty bad when it's a government agent the jurors are likely to respect. It's that he gives all the reasons. The prosecutor on redirect gets to have him give four sort of arguably potentially solid reasons about why he didn't believe Mr. Velasquez. And that is almost like having the agent, an official government agent, giving a closing argument under oath and examination about why the defendant shouldn't be believed. So can you clarify the timeline a little bit? So the defense counsel raises this topic in the context of trying to establish that the agent was badgering. And then the government attorney on redirect asks the question and the objection is sustained. Then when did the additional questioning occur? Let me go back and take a little more step in time. First of all, you have the agent testifying the case in chief. Two questions, only two, get asked then. One is that told him you didn't believe him question that's sandwiched between the other questions about confrontation. That gets answered. Then there's a second question about in essence you didn't believe him, which doesn't get answered. And those are questions from defense counsel? Yeah, right. The case in chief. Nothing then happens on redirect at that point. Then the agent gets recalled and rebuttal after Mr. Velasquez testifies. Then there's a all the defense attorney is asking about is you challenged him, didn't you? The defense attorney asked him, I think, six times. He uses the word in some way or the phrase in some way or another. You challenged him in response to one of those questions. The agent volunteers. No, I wasn't challenging him because whatever. I challenged him because it didn't make sense to me, basically saying I didn't believe him. Then all the defense attorney does with that is basically loop it back to challenge. He says, OK, so you didn't believe him, right? Yes. And that's why you challenged him. Right. So to the extent there, the agent volunteers it. The defense attorney doesn't elicit it on his own. And all the defense attorney does with it is basically loop it back into the challenging theme. Then on redirect in that rebuttal testimony, the government gets up and over the defense attorney's objection, ask for a whole bunch of reasons why he didn't believe that. And that's where you get, I think, four separate reasons given about why the agent didn't believe him. In addition, just the fact that he didn't believe. I see him running out of time. I did want to save some for rebuttal. I don't know if I'll give you some time for rebuttal, Mr. Gunn. OK, so that I hope I've outlined the timeline there as well as I can, for your honor. Yes, thank you. OK, let's let's let's hear from the government and we'll come back for rebuttal. Thank you, your honor. Good morning. Please, the court. Benjamin Hawley for the United States. The picking up on that last issue in terms of the timeline, one clarification or correction as to what happened at the end with the cross-examination and rebuttal. This is a page 400 of the supplemental excerpts. The defense counsel asked in this line question, so you didn't believe him. You didn't believe Mr. Velazquez. The answer is correct. That wasn't objected to. That testimony came in later down on the page after a couple more questions. That's when the agent or that's when there's an objection that is sustained. But in terms of the timeline, it was defense counsel who first brought up the agents believing Mr. Velazquez or not on cross-examination in the case in chief. Mr. Velazquez then testifies in his case that the agents didn't believe him and that they were badgering him. Then in the rebuttal case, the government tries to get into it. Objection is sustained. So at that point, the issue was done. The defense brought it up twice. The government's attempt to address it was objected to and sustained and there was nothing more to address. And yet, despite that objection being sustained on cross-examination, defense counsel comes back to it yet again, asking more questions about whether the agent believed him and not just whether he told him that, whether he actually did. So there was no error here, but even if there were, it was harmless. And the reason for that or evidence of that is in a closing argument, the government only argued about the substance of the statement and how it evolved into his trial testimony and that inconsistency. They never said or even implied that the jury should disbelieve the defendant because the agent did. That would, of course, be improper. But that argument was never made, was never even hinted at. Instead, it was all about the substance of the statement, the exact same thing that Mr. Velazquez had testified to. But Mr. Hawley, when did the questions occur that Mr. Gunz explained where the government elicited for reasons why the agent didn't believe the defendant? So that was in the rebuttal case on redirect examination. So cross-examination in the case in chief brings it up first, then it's done. Mr. Velazquez testifies about it. Rebuttal case, direct exam, we don't discuss it. Cross-examination, it comes up or rather we try to ask about objection sustained. Cross-examination comes up again. And then on redirect is when the prosecutor gets into more of the detail about that topic, exactly that topic of you didn't believe. And when you say you bring it up on direct objection sustained, that's the question where the prosecutor asked the agent whether he believed the defendant and the agent said no, even though the objection was sustained. It appears from the transcript that they were simultaneously. He started answering the question as the objection was happening. So the court reported as they should wrote both down. I'm not sure why in the courtroom, how it came out. But yes, it was, the answer came through. It didn't look like the judge then went on to say and the witness's answer is stricken and the jury should disregard it. Is that right? That's correct. That's correct. The defense didn't ask, move to strike, but there is the general instruction that the jury was given that if objections were sustained, you should not consider that evidence. And there's no reason to believe that the jury disregarded that here. And again, even if that one answer did come through, even if there hadn't been an objection at that point, this is already the topic that defense has raised twice. And again, there's no reason to believe the jury disbelieved Mr. Velasquez purely because the agent said that he also did not believe him. It was clear from the testimony from Mr. Velasquez and the agent that this interview was... Was the government's purpose in asking these questions about why the agent didn't believe Mr. Velasquez at the time? Was that to rehabilitate or to... What was the purpose of that? I would say it was more to rebut because the testimony at that point through the cross-examination by defense counsel had been that this interview was very confrontational, that the agent just was not letting Mr. Velasquez talk, was not interested in the truth. He only wanted to get that confession. He was mocking him. He was just trying to get the confession because this defense counsel tried to say in cross-examination, that would make the case and then you can be done. And so by explaining the why is showing, well, I have reasons to not just take his statements at face value. I wasn't just badgering for the sake of badgering. I was, as the agent had testified, trying to get facts, trying to get the truth. And there were holes in that story I was trying to follow up on. But again, then in argument or even in further questions, the government never says, and therefore, jury, you should also just believe Mr. Velasquez because the agent did. It's not even hinted at. And so again, I don't think there was the error, but it was harmless in either case because of the way the rest of the evidence came out. So, Mr. Hawley, I have two questions for you that are really questions about the record. They go to different issues and they're not about the issue you're talking about now, but I'd like to know these things factually. The first is, did Mr. Velasquez invoke his Miranda rights at any time when he was being interviewed by the agents after his apprehension? No. He gave a full statement and then the interview terminated. Okay. So to be clear, this is not a circumstance where he started to make a statement and then invoked his Miranda rights. Okay. The second question I have is, he talked to two agents. I understand that. And the timeline, it appears that he spoke with the first agent, I think agent Day, at about 11.23 in the morning. And that's when he made the statement that the car belonged to his cousin, which he later said was actually not an accurate or true statement. But then it appears he spoke to another agent, but it looks like it was more like 4.30 in the afternoon, like five hours later. But I'm not certain of that timing. When was the second interview? So I don't have the exact times, but I think that first interview, so to speak, wasn't an interrogation interview. It was when he came up to primary inspection and it was the regular officer there who was just asking the standard questions. And that's when that initial lie came out. They find the drugs. He goes to secondary inspection. They find the drugs. He's then held in the holding area until they can get that figured out and have the agent come down. That's then agent Day who appears for the interview or the interrogation at that point. And that's when he then gives these stories that we're talking about and explains the prior lie. But do we have any sense of the timing? I mean, did this happen within 20 minutes or are we actually talking about several hours? It was several hours. I don't have the exact time, but it was several hours. Because among other things, the agent isn't at the port of entry. They usually, once drugs are found, as in this case, they call a Homeland Security agent who then travels down, reviews whatever evidence there is already before they're going to the interview. So that process takes some amount of time. I'd like to ask you about the prosecutor's reasonable doubt closing argument. Your brief seems to be quite unconcerned with that. That you didn't appear to be very troubled by his statement with that respect to whether or not it was adequately cured. And I was a bit taken aback by that. Can you explain your position that the prosecutor's argument with respect to reasonable doubt was not itself something that needed correction and therefore it's not pertinent whether the court adequately corrected it? I wouldn't phrase it quite that way. I think our argument is there was not error and it was proper, but regardless, the easiest path or the most obvious path to affirmance is that it was harmless because of all those corrections. So we didn't spend as much time arguing and the merits of it as it were because all of those corrections would have cured any error. And that's what discourse cases have said in numerous closing argument contexts, including in these minimizing the reasonable doubt standard type of arguments, court errors or rather instructions can cure those types of errors. But obviously the gravity of the error goes to how much correction the court needs to make. And of course, as the defense argued at the end, the last objection, the court made no correction at all on. And so if we were to conclude that it wasn't a serious error, then we may be less troubled by what the court did or did not do than if we think that statement was more an error. And you're saying that although you think the court adequately corrected it, it is the government's position that the statement itself was not seriously an error with respect to the reasonable doubt standard. Correct. And the reason for that is because the prosecutor wasn't minimizing the reasonable doubt standard. He was trying to explain that there's a gap between reasonable doubt and beyond all doubt because defense counsel, as is very standard, had argued, you know, to push that reasonable doubt up, that there's all these other types of standards in law. And so reasonable doubt is the highest, which is fine. And that's a standard argument. And you don't think his daily issues, examples, trivialize the reasonable doubt? No, because he was talking about the risk of these things. So for example, commuting into work, it's possible that you would get in a wreck or not be able to get to the courthouse. But it's so it's not beyond all doubt that you would make it, but it's beyond a reasonable doubt that you would be able to get there. So again, that's why I say the argument was about that gap of trying to explain that beyond reasonable doubt, beyond all possible doubt are two different levels. And I don't think he was minimizing the beyond reasonable doubt in that way. And just answer a point you made previously in your question that the court didn't provide an extra instruction that second time that it was objected to. At that point, the court had already given four arguments. She instructed the standard instruction that the attorney's arguments are not evidence. Here's the reasonable doubt standard. Listen to the court's instruction three times during both the prosecution and government, or sorry, and defense closing. Then she gave specific instructions. So for example, she said, you will follow my instructions as a reasonable doubt, not as what any attorney says. The standard is I instructed you on the standard. You should follow that instruction. So the fact that there was another objection, and she didn't give that same instruction yet a fifth time, I don't think implies that the court therefore agreed. It's not just that she didn't give the instruction. She didn't sustain the objection, correct? That's correct. Throughout the closings, again, on both sides, the court was trying to avoid jumping in and saying, this is right or this is wrong, and just kept referring back. And it wasn't just about this type of argument, but in general, when there were objections, she was saying, I just remind the jury, read the instructions for your view of the evidence controls, not what the attorney says. And so it was trying to avoid that kind of coming down on side or the other in a sense of skewing things. Instead, it was reminding the jury, here are the instructions. I've already told you that's the law that you need to follow. And so it would require us, the opposite result would require us to assume the jurors read into her overruling and lack of further instruction that she implicitly agreed with the prosecution, and that therefore they should implicitly reject all the other statements that she specifically gave that these instructions should be followed. There's just no reason to do that. This is not a situation where any error was so gross as to probably prejudice the defendant standard this court has set up. And therefore, even if there were error, which again, we don't think there was, it wouldn't be harmless given all of the instructions. I'm happy to answer questions on any of the other issues or if the court has any further questions. I guess I have a question about the record with respect to the argument on completeness as to whether the jury was allowed to hear the defendant's explanation as to why he lied about the ownership of the car. I'm not clear on the record. I think the defendant ultimately got that testimony in, but did that happen before or after the government statements objected to here? That is, so it came in during his testimony. This is page 352 of the supplemental excerpts. That's when he said that that's when he explained the prior lie and that it wasn't his cousin's car and kind of gave all that story. So that would have been after the agent initially testified about after there was an objection, I think that was during the government's case. And again, that just goes to the harmlessness that again, for legal and factual reasons, we don't think there was a completeness error here. It wasn't explaining a lie. It was a statement. It wasn't completing a statement. It was just a later statement referring back to the first one. And the fact that they refer to each other doesn't mean they have to be considered together in fairness. There was nothing misleading or distorting about that initial lie. The fact that he later comes up with an explanation doesn't mean he gets to get those in, you know, something that would be prohibited by the rules of evidence. But again, regardless of that, if there was an error or not, he got that story out, testified to it. The agent also testified at the time of the interview, he was aware of the paperwork and of this story. Unless the court has any other questions. Thank you. Okay. Thank you, counsel. Okay. Mr. Gunn. Thank you, Your Honor. I'll put two minutes upon the clock. Very good, Your Honor. Thank you. Just real quick. I don't want to spend a lot of time on it. Mr. Gunn, I'm again having trouble hearing you. Maybe you could. Is that better, Your Honor? Yes. Thank you so much. Okay. On the complete, I don't want to spend a lot of time on the completeness issue. But our argument here is that it was a big difference to explain it in testimony a year or two later versus having the jury know that he corrected that lie to the agent within a few hours. So that's the point there on the completeness. On the reasonable doubt, the key here, the problem with the instruction that the court referred the jurors back to is it didn't say anything about the type of decision. So just referring the jurors back to that instruction didn't cure the prosecutor's misstatement. I also want the court to know that this was a reasonable doubt argument case. If you look at the defense attorney closing argument, starting at supplemental excerpt of record 459, reasonable doubt is the second sentence of his argument. Then he spends the next two pages talking about what reasonable doubt is. He spends six pages talking about a list of reasonable doubts, one of which is the existence of Juan, Rao, and Emanuel. He then talks about why the government's evidence didn't establish reasonable doubt for three pages. Mr. Gunn, isn't that always the case? You're talking to three judges who all worked in trial courts. I don't think I've ever seen a defense court on that didn't talk about reasonable doubt because that's a very powerful tool in the defense's toolbox. I tried lots of cases when I was a trial lawyer too, Your Honor. I had cases where that was what I talked about almost my whole argument probably, but I also had cases where I talked at the beginning, then I talked about the evidence without talking about reasonable doubt, and then I talked about reasonable doubt at the end. The point I'm making is this case, if you look at his argument, it was reasonable doubt all the way through. Some cases are like that. Some cases, you're more talking about my witnesses said this and their witnesses said that and my witnesses telling the truth because of this and theirs aren't because of that. So I think in that sense, this was more focused on reasonable doubt than a lot of cases. I was hoping to talk a little bit back about the testimony on truthfulness issue if I could take just one more minute. Go ahead. First of all, the answer was given. This isn't a case where there was a question with no answer on the government's direct. The questions on cross were not about you don't believe, except when the agent volunteered that in response to you were challenging him. The questions on cross in the rebuttal testimony were about the agent challenging Mr. Velasquez and putting pressure on him. The explanation, you don't need to rehabilitate the agent about why he told Mr. Velasquez he didn't believe him. Under the Dean case, why the agents did what they did doesn't matter. That's irrelevant. That's not a basis for putting the testimony in. And the government didn't use it in an argument. They didn't need to because the agent had already made the argument for them by being allowed to give his reasons. And that was what the worst impropriety here was. I'll submit it unless the court has questions. Thank you, Mr. Gunn. Thank you, counsel. We appreciate your arguments this morning. The matter is submitted at this time.
judges: Paez, Melgren, Bade